The District Court erred by failing to submit Mr. Blair's failure to protect claim to the jury because the direct and circumstantial evidence at trial showed that Mr. Blair told Mr. Terry, I've got a hit on me. Mr. Terry said Mr. Blair is the victim here, and yet Mr. Blair was released to general population. Counsel, what about the, what apparently were several requests by the plaintiff to be released back to general population after spending a period of time in segregation and feeling that what he really wanted was to be back in the general population? That's correct, Your Honor. Mr. Blair did submit a handful of protective custody waivers, and the court mentioned those in the District Court's ruling in favor of Mr. Terry's motion for judgment as a matter of law. But the District Court erred in relying so heavily on those protective custody waivers and the letters that Mr. Blair wrote to individuals other than Mr. Terry for several reasons. First, the question of Mr. Blair's mindset or his desires is not controlling here. The question is of one of Mr. Terry's subjective state of mind. What he knew or what the circumstantial and direct evidence showed that he knew. So although it is correct that Mr. Blair submitted these protective custody waivers, Mr. Blair did not have to give Mr. Terry notice of this threat to him in general population. So what did Terry know that would have given him the ability to make an inference and then be responsible for making that inference? Yes, Your Honor. There was both direct and circumstantial evidence at trial that showed Mr. Terry was aware of this risk. First, just about one week after the attack on Mr. Blair's life, Mr. Blair directly told Mr. Terry, I've got a hit on me, and I need protective custody. Then on top of that, there was a bunch of... And he got it, right? Correct, Your Honor. He was in administrative segregation for two months, but then ultimately was released into general population. And immediately before Mr. Blair was released into general population, Mr. Terry stated to the warden of South Central Correctional Center, Mr. Blair is the victim here. On top of that, Mr. Terry knew that Mr. Blair had been attacked just hours after arriving at South Central Correctional Center. Is that two months before? Is there two months between the two attacks? How long is the period between the two attacks? The one arriving in... Exactly two months, Your Honor. Thank you. Go ahead. So, although Mr. Blair told Mr. Terry during that April 13th conversation, which was about a week after the first attack, that he did not know the individual who had attacked him, that was again reiterated in Mr. Blair's June 1st letter to Warden Bowersox, which the evidence showed was then given to Mr. Terry. And in that letter, it was given to Mr. Terry just a day or two before Mr. Blair was released into general population. What relevance is there, though, that the person who initially attacked him, my understanding was placed in administrative segregation himself, so that the person who had initially stabbed him was no longer in the general population? That's correct, Your Honor. The quasi-Mahasin, the individual who stabbed Mr. Blair, was placed in administrative segregation. But Mr. Blair told Mr. Terry, I've got a hit on me. And he told him he believed it had to do with something to do with his murder charge that he was serving time for. But I think the problem I'm having with that, I think, is that if you look at the Farmer versus Brennan case, the specific terminology they use is an excessive risk of harm. And if you look at it from Mr. Terry's point of view, certainly the fact that Mr. Blair had been stabbed is harmful. I mean, nobody's going to dispute that. I mean, that's a grave harm. But at the same time, that person is now in administrative segregation and can't get it, Mr. Blair. And you have such a vague allegation, there's a hit on me, with no specificity as to who it is or what would happen. How is that ignoring an excessive, excessive risk of harm? That seems to be a very substantial, grave risk of harm. And that's what the court uses, a substantial risk of harm. I guess I'm having a hard time seeing that. Your Honor, Mr. Terry's own statements just a day or two before Mr. Blair was released into general population show that he recognized that there was still some risk in releasing Mr. Blair into general population. Some risk, but is there excessive risk? Excessive risk of releasing Mr. Blair into general population. Specifically, as I stated, he told the warden, Mr. Blair is a victim here. But on top of that, he specifically stated to Warden Terry, he was asking if there's nothing else on the investigation, and we have nothing showing us there's any danger for him. But the fact was, at that time that Mr. Blair was released, the investigation had been concluded. And in fact, the individual who had attacked Mr. Blair the first time, the one that was in administrative segregation, hadn't even been interviewed yet. He wasn't interviewed until two days after Mr. Blair was attacked for the second time. So the fact remained that Mr. Blair, or Mr. Terry knew that Mr. Blair had been attacked by a stranger just hours after arriving at the institution. On top of that, that Mr. Blair told Mr. Terry, I've got a hit on me. Which makes sense in terms of our general understanding of what a hit is. But then comes all of these statements and his own letters saying I need to be back in the general population. How is it more than negligence for the warden to say, okay, the guy that stabbed you, he's not out there anymore. This is what you want. You were the victim. You didn't perpetrate this. There's no reason for us to keep you segregated. Go back. First, your honor, as to the letters that Mr. Blair wrote, particularly the letters that Mr. Blair wrote to Investigator Schaefer and an individual outside of the prison, Ismail Muhammad, the district court relied pretty heavily on those particular letters and its opinion. How is it more than negligence to have relied on that? Because your honor, the relevant question here is not one of what other people knew, what an investigator knew, or what an individual outside the prison knew. The question is, what did Mr. Terry know? And so in relying on these letters, where there was absolutely no evidence at trial that Mr. Terry received those letters, that he had knowledge of those letters, and anything that Mr. Blair stated in those letters, there was no evidence showing that that then affected Mr. Terry's ultimate state, his knowledge of whether there was a substantial risk of harm to Mr. Blair in the general population. And so the district court erred by then not also applying the standard for deciding a motion for a judgment as a matter of law, and allowing all reasonable inferences to be drawn or considered in Mr. Blair's favor, because at trial, he also provided explanations as to why he signed those protective custody waivers. But doesn't it indicate that at least the plaintiff doesn't think the risk is that great if he wants to be back in general population, but in his estimation, he wasn't himself afraid of some imminent attack? And Your Honor, that's certainly an inference the jury could have drawn from that evidence had it been submitted to the jury. But the fact was that Mr. Blair provided an explanation about his belief that because Mr. Terry had already told him, you're not going to protective custody, get protective custody out of your head, I'm going to keep you in administrative segregation indefinitely. As Mr. Blair understood it, protective custody was off the table for him. And so as a result, he explained at each of the classification hearings, signed the protective custody waivers, that that was his understanding that the individual who's in charge of offender classification and housing recommendations, who ultimately signs off on it, had already told him that that wasn't an option. And so that's information, that's the kind of inference that the jury should have been allowed to consider. Suppose he had knowledge, suppose Terry had knowledge, and I think, you know, I'm going to go back and look at the record. I think there's at least some circumstantial evidence that he might have, but you may be right. But suppose he did have knowledge. I'm going to ask a simple question. How can it be reckless to give the prisoner what he wanted, even if, as you say, Mr. Blair or Mr. Terry told Mr. Blair, look, you got two choices, general population or administrative segregation, you know, you got to pick one of the two. Gave him what he wanted. How can that be reckless on the part of Mr. Terry? Because the foundational principle of the Eighth Amendment and Mr. Terry's duty to protect Mr. Blair from harm at the hands of other prisoners. And by totally disregarding that duty and saying right before Mr. Blair was released, Mr. Blair is the victim here, he violated Mr. Blair's Eighth Amendment rights. Your Honors, I see I'm running into my rebuttal time. We do not have any more questions. I will save the rest of my time. Thank you, Ms. Stillman. Thank you. Mr. Reed. Judges, and may it please the Court, Peter Reed for Deputy Warden Terry. Terry is entitled to qualified immunity for three reasons here. First, Mr. Blair was released into general population at his own repeated request and only after he repeatedly stated he was unaware of any risk to him in general population. Did Mr. Terry know that? You heard me talking with opposing counsel about that. Is there any evidence that Mr. Terry knew any of that? Yes, absolutely. So I would make two points. One, I would disagree with opposing counsel that the only question that matters here is Mr. Terry's subjective knowledge. The burden of proving both an objective substantial risk and a subjective substantial risk. When it comes to Mr. Terry's own knowledge, these waivers are in his file. For example, Mr. Terry, or excuse me, Mr. Terry was the supervisor who signed off on one of these committee, housing committee status hearings. So there were two different housing status hearings and Mr. Blair, or Mr. Terry signed off on the first one. So he is signing off on a statement that says, Mr. Terry did not request protective custody. Mr. Terry submitted a waiver stating, I don't want protective custody, I'm unaware of any threat. There are at least 10 different instances in the record where Mr. Blair stated that he wanted general, he wanted to be in general population, he didn't want protective custody. Okay, now Mr. Terry testified, right? Yes, sir. Yeah, we've got real evidence in this case. So tell me of those 10 you said, how many did Terry say he knew about? So I don't know if he went through each of the 10, let me think about this. We know that he's aware of the committee hearing that he saw and the waiver that was signed at that committee hearing. I don't know whether he's aware of the appeals from those two committee hearings. I do know he's aware of the letter that Mr. Blair sent to Mr. Terry's supervisor, the deputy warden. There's a number of instances. Sounds like about half. Well, yeah, I think that's probably fair, about half. And again, the first question that we ask here is whether there's an objective substantial risk of ongoing. And so we need to consider the whole record, consider whether there's an objective risk before we turn to the deputy warden's subjective knowledge of that risk. So some of these statements, I'll only cite a couple of them. So on April 15th, and again, on May 13th, he signs a waiver that says, I am not aware of any enemies among the inmate population, and I do not believe I am in any danger, unquote. And later in an appeal from one of these status hearing committees, he says, I want to be in general population. There's no reason to keep me in administrative segregation. And one of the facts he cites in support of that is exactly what we argue in our brief today. He says, quote, the person who supposedly assaulted me and I were both detained immediately and the incident was isolated, unquote. That's on JA 703. Mr. Reed, is there anything in the record to indicate the two attacks were connected? Your Honor, I don't know of anything in the record. The question is whether, at the point of release, there was any reason to suspect a second attack. And at that point, the reason I ask is, if there's something to show they were, then maybe there would be some inference that could be made about being able to predict it. Right. But so you're saying there's nothing to indicate that the two attacks were in some way coordinated or connected? Right, Your Honor. Mr. Blair testified too, right? Yes, he did. Okay. Absolutely right. Did he say the two attacks were connected? Yes. Okay, how? And that's exactly right. How? So this is on page 54 of the transcript. He talks about a conversation, and this is disputed, but we'll review under Mr. Blair's version of this conversation that I have with Mr. Terry. He says, I think there was a hit-out on me. And if you look at page 54 of the transcript, he continues, and he says, I got a hit-out on me, and he asked me, what, you know, this is Terry, why would I believe that I had a hit-out on me? I told him I felt at the time, or believed at that time, that it had something to do with my murder case, the case that I'm doing time for. I believe that some of my, I believe that my victim had some relatives at that institution, and that was maybe the reason why I was stabbed, because I didn't know why I was stabbed, unquote. I think that this statement is very- Does he mean the first time or the second time in what you're referring to? This is the first time, Your Honor. Yeah, okay, I got that. This is the first time. So- Is there something that connects the second time to the first time in Mr. Blair's testimony? You know, I think that it is similar speculation to this. I am not sure of the specific answer to her question of whether he comes up with anything later on. What I do know is that at the time he has this conversation with Mr. Cherry, he repeatedly uses words that indicate that he is speculating. He ends his statement with the phrase, I don't know why I was stabbed, unquote. And under this court's precedent, and other circuits as well, speculative statements about a future risk are not sufficient to establish a substantial risk of intimate harm. I want to ask you really about the main theory of opposing counsel, something that, you know, which is essentially the argument I think is, is you twisted my arm. I mean, the whole, the administrative segregation, which is nicknamed the whole, does not sound like a nice place. I've seen administrative segregation in other prisons, obviously not this prison, not a nice place. And so you get the choice of being essentially in solitary or being in the general population, which is, you know, kind of a Hobson's choice. And he says, look, there was a third option, protective custody, but they didn't take that seriously. And so essentially, you know, Mr. Terry twisted my arm into taking the lesser of two evils. And that's why I did the things I did. It was, it was compelled. What's, what's the state's best response on that? So two things, your honor. The first is that even taking those statements on there, on his face, Mr. Blair himself indicates repeatedly that he is unaware of an ongoing risk. He's going to make that argument today. He needs to have stated at the time that he was aware of an ongoing risk. And we have multiple statements over two months where Mr. Blair himself says, I'm not aware of an ongoing risk because he stood by those statements until the day he was released in a general population. The deputy one was entitled to rely on those under qualified immunity. The second part of that answer, I think is it's, it's not that simple. You can't just put any offender in protective custody into a protective custody housing unit. And I think here there's a distinction that is made by both parties in the briefs between protective housing, protective custody status and protective custody housing. You can't put aggressive, dangerous inmates in a protective custody unit. That's a problem where they're interact, that's the purpose of protective custody is to keep certain inmates away from aggressive, dangerous inmates. And so the testimony, at least according to Mr. Blair's version of events, is that Mr. Terry said, look, you're an aggressive, dangerous defendant. You're in here for homicide. We can't just put you in protective custody with all the other inmates who are in protective custody. And so what we have here, I don't think is a Hobson choice. I think what we have is a difficult choice being made by prison administrators dealing with a dangerous inmate who doesn't, who's not cooperating. He repeatedly states, I don't want protective custody. I'm unaware of any threat against me between administrative segregation and general population. And Mr. Terry's own testimony, he says, look, I knew of any ongoing risk in general population, I would have left him right where he was. That's where he would have been protected if there had been knowledge of a substantial risk. Here, there wasn't knowledge of a substantial risk. There's no evidence aside from Mr. Blair's own statements of any kind of ongoing risk. And Mr. Blair himself repeatedly denies that earlier statement by saying, I don't know about any risk. I'm not aware of any risk. I don't want protective custody. I want to be released to the general population. He makes the same arguments that I'm making here today. In my remaining time, I'd like to turn to a third point, which is that Mr. Terry and the prison facility took reasonable measures to protect Mr. Blair. Start with Deputy Warden Terry. Terry is not the deputy warden who signed off on Blair's release. Nothing in the record indicates that he was the one who signed off on his release. What is in the record is that he ordered a special review of Blair's housing status on June 5. It was a different deputy warden, Deputy Warden Ballinger, who was listed as the supervisor for that housing committee hearing. So Terry, insofar as there's a qualified immunity case, what Terry did was say, we should order one more hearing and make sure that we know what we're doing here. That's the limit of his participation in that decision. And second, the prison facility generally took a number of steps. They secured his attacker, they referred the attack to the Inspector General, a third party for investigation. They placed Blair in administrative segregation for two months and tried to do so for longer, only agreed to put him back in the general population after he repeatedly requested that they do that. They held multiple hearings and appeals, discussed his housing status, and they held this special review hearing on June 5. We have a number of statements from Mr. Blair, the only possible source of any knowledge of an ongoing risk, saying that he is unaware of any ongoing risk, and under qualified immunity, the prison facility and Mr. Terry were entitled to rely on that. Qualified immunity protects all but the plainly incompetent. That's not what we have here. We have a difficult choice, where Mr. Blair was given exactly what he requested, released into general population. He was unaware. Thank you, Mr. Reed. Ms. Dillon. Thank you, Your Honors. Your Honors, you asked if there was any evidence connecting the first attack and the second attack, and Mr. Blair's testimony at trial showed that at the first attack, an individual named Monty Ross came up and put his arm around Mr. Blair to identify him to his assailant, who, as he testified, did not know Mr. Blair and he did not know him. Then, at the second attack, Mr. Blair, lo and behold, Monty Ross shows up again and starts a conversation with Mr. Blair and distracts him so the assailant can come up and stab Mr. Blair in the back for the second time. Thank you, Your Honors. Thank you, Ms. Dillon. Ms. Dillon, is it accurate that you're representing as appointed counsel in this case? That's correct. The court wishes to thank you for your willingness to provide counsel. Thank you. Thank you. The court thanks both counsel for your presence and the argument you provided to the court today. We'll take the case under advisement. You may be excused.